2025 IL App (1st) 232259-U

THIRD DIVISION
April 30, 2025

No. 1-23-2259

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| CHRISTIAN K. NARKIEWICZ-LAINE, | ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 2019 L 003219 |
| | ) | |
| THORNDALE BEACH NORTH CONDOMINIUM ASSOCIATION, | ) | |
| | ) | Honorable Daniel J. Kubasiak, |
| Defendant-Appellee. | ) | Judge, presiding. |

JUSTICE D.B. WALKER delivered the judgment of the court.
Presiding Justice Lampkin and Justice Martin concurred in the judgment.

**ORDER**

¶ 1    ***Held:***    The trial court did not err in granting defendant's motion for summary judgment because plaintiff's claims are barred by the statute of limitations.  Affirmed.

¶ 2    Plaintiff Christian K. Narkiewicz-Laine filed a complaint against defendant Thorndale Beach North Condominium Association (Thorndale) alleging in part breach of fiduciary duty and breach of contract, in connection with the alleged failure to maintain a condominium building. Defendant filed a motion for summary judgment pursuant to section 2-1005(a) of the Code of Civil Procedure (Code) (735 ILCS 5/2-1005(a) (West 2020)).  The trial court granted defendant's motion, and plaintiff appeals, contending that there were genuine issues of material fact as to the

timeliness of plaintiff's claims relating to various instances of kitchen waste and sewage backups into his condominium unit, precluding summary judgment. We affirm.

¶ 3                                        BACKGROUND

¶ 4    Plaintiff is the owner of a condominium unit (2F) in a building located at 5901 North Sheridan Road in Chicago. Thorndale is the condominium association for the building where the unit is located and is governed by both the Condominium Property Act (the Act) (765 ILCS 605/1 *et seq.* (West 2022)) and its "Declaration of Condominium Ownership and of Easements, Restrictions[,] and Covenants for 'Thorndale Beach North Condominium' " (the Declaration). Plaintiff has occupied the unit since January 2007, and he has owned that unit since approximately January 24, 2009. Plaintiff's parents owned and lived in the unit from 1996 until plaintiff's mother died in 2000. After that point, plaintiff's father left the unit and did not return to it. Plaintiff inherited the unit when his father died in 2003.

¶ 5                                   Plaintiff's Complaint

¶ 6    On March 26, 2019, plaintiff filed his initial complaint alleging breach of fiduciary duty and breach of contract. On May 20, 2019, defendant filed a motion to dismiss the complaint, arguing, *inter alia*, that plaintiff lacked standing and that his claims were barred by the statute of limitations. On June 19, 2019, the trial court granted plaintiff leave to file a first amended complaint on or before July 17, 2019, and it allowed defendant to withdraw its motion to dismiss without prejudice to raising arguments with respect to plaintiff's first amended complaint.

¶ 7    On July 17, 2019, plaintiff filed his first amended complaint against defendant. Plaintiff asserted four counts: breach of fiduciary duty (count I), trespass (count II), conversion (count III), and breach of contract (count IV).[1] The breach of fiduciary duty count alleged in relevant part

---

[1] The trial court subsequently granted plaintiff's motion to voluntarily dismiss count II (trespass) and count III (conversion). Those counts are not before this court.

that, in September 2008, while plaintiff was an occupant of the unit, defendant (via the president of its board of managers, Sigrid Ingold) failed to "maintain and upkeep [*sic*] the plumbing and sewage systems in the common elements of the condominium building," resulting in a substantial discharge of sewer water into the unit and substantial damage to both the unit (including a decrease in its market value) and plaintiff's personal property (hereinafter the Water Claims).

¶ 8    The breach of contract count mirrored the breach of fiduciary duty count. This count stated that, in September 2008, defendant (through Ingold) failed to perform its contractual obligations under the Declaration to undertake repairs, upkeep, and maintenance of the common areas of the building to prevent damage to plaintiff's unit and personal property. Defendant's failure to do so also allegedly resulted in damage to plaintiff's personal property and the unit.[2]

¶ 9                              Defendant's Motion for Summary Judgment

¶ 10    On March 29, 2022, defendant filed its motion for summary judgment pursuant to section 2-1005(a) of the Code. Defendant argued in part that plaintiff's Water Claims (counts I and IV) were time-barred because plaintiff admitted to observing water backup between 1996 and 2008 and the 2008 water backup issue had not been resolved. Defendant argued that a five-year statute of limitations applied for both count I (breach of fiduciary duty) and count IV (breach of contract). Defendant noted that, on April 12, 2016, plaintiff first filed these claims as part of a counterclaim against Thorndale in response to Thorndale's complaint for possession and breach of contract (predicated upon plaintiff's purported failure to pay various fees owed to Thorndale). Defendant then reasoned that plaintiff's claims in the instant complaint were time-barred because defendant was aware of defendant's allegedly tortious conduct prior to April 12, 2011 (*i.e.*, five years prior

---

[2] Plaintiff also alleged various breaches of fiduciary duty and contract relating to Ingold's actions as the president of defendant's board of managers (the Ingold Claims), but plaintiff does not challenge the trial court's ruling on those claims. We therefore do not consider them here.

to the filing of his counterclaim). Specifically, defendant's motion stated, "Thus, to the extent that Plaintiff had knowledge of the conduct giving rise to these claims prior to April 12, 2011—five years before the filing of the 2016 Counterclaim, these claims are time-barred."[3]

¶ 11 Defendant attached to its motion a transcript of plaintiff's deposition, which took place on February 5, 2021. During that deposition, plaintiff stated that there was a "[s]ewer backup continuously" while both of his parents lived in the residence. He further stated that his parents moved into the residence in 1996, and he had been "aware of *** the plumbing failures" since that time. When defense counsel reiterated, "The minute you moved in, your parents and you were aware of sewer backup?" Plaintiff responded, "Precisely." Plaintiff added that, after his mother died in 2000, plaintiff placed his father in a nursing home and "wouldn't permit" his father to move back into the unit due in part to "the health risk of being in an environment where the sewers were backing up." Plaintiff clarified that, before going to the nursing home, his father had been hospitalized "for a year" after having suffered a stroke.

¶ 12 Plaintiff further stated that he had been in the unit many times when there was a sewage backup between the time his parents first moved in and 2008. Plaintiff added that, sometimes there would be a minor backup and sometimes it would be major backups "usually accompanied by some kind of explosion." When asked to explain what he meant by "explosion," plaintiff stated that there would be "a big bang and then the sinks would be full and overrunning with sewage." When asked, plaintiff responded that the "2008 sewage issue" had not been resolved.

---

[3] Defendant's brief erroneously states the summary judgment motion argued plaintiff was aware of the Water Claims "no later than" April 12, 2011, which would make his claim timely.

¶ 13   Defense counsel then asked plaintiff regarding any sewage backups after 2008.  The following colloquy then took place:

"Q.  Okay.  Between 2008 and 2018, that ten-year period, do you recall any other sewage backups?

* * *

A.  Yes.

Q.  Okay.  What year did you see backups occur?

A.   After 2008, it was a long time after 2008, and then suddenly they were back again.

Q.  Right.

I think you know where I'm going.  There was an incident in 2018, which we can talk about.  I really want to know about the years 2009, '10, '11, '12, '13, '14, '15, '16, and '17.  I want to know those years.

Do you have any recollection of any type of sewage backup for those nine years?

A.  Yes.

Q.  Okay.  When do you recall the sewage backups out of one of those years I just gave you?

A.  My recollection was that there was a long period between 2008 when there was no activity and then suddenly the activity was back again."

When asked when that activity returned, plaintiff again responded, "I don't recall."

¶ 14    Plaintiff was then asked whether anyone told him why the sewage backups started again. Plaintiff said that, when he was at a board meeting, Ingold stated that "the grease traps were like a brick." Plaintiff could not recall what year that meeting occurred.

¶ 15    During his deposition, plaintiff acknowledged that he wrote a letter dated October 31, 2009, which stated in part that he and an associate had to make substantial repairs to the kitchen "[b]ecause of the constant sewer back up during the time my father was in the hospital *** and from all the pervious [*sic*] overflows before[,] which started sometime back in 1999." Plaintiff's letter further stated that, "Because [defendant] refused to fix the continuous internal problem of the constant sewer back up in Unit 2F, which led to the flood in September 2008, *** I never moved my father back to his unit ***." Plaintiff's letter demanded repayment of $333,331.97. Plaintiff further acknowledged sending a letter dated June 10, 2010, to Ingold threatening a "day of reckoning," which plaintiff explained was a "court case in front of a judge."

¶ 16    Defendant's motion also attached multiple letters, purportedly signed by plaintiff, as an exhibit to its motion. The first letter, dated September 21, 2004, stated that plaintiff learned at the August board meeting that defendant had "cleaned" the sewer system but had not done so in "years." This letter further characterized defendant as "absolutely negligent" in failing to maintain the sewer system. Another letter dated November 23, 2004, complained that the sewer was again backing up into plaintiff's kitchen sink in unit 2F and that this has happened "numerous times" in the prior week. A third letter to defendant, dated April 12, 2005, stated that the "sewer backup (which continues in Unit 2F) is a building problem, NOT the Unit's."

¶ 17    Defendant also included an unsigned letter purportedly from plaintiff's father to the then-mayor of Chicago dated April 3, 2005. This letter complained, *inter alia*, of harassment by defendant's board and stating that the sewer had been backing up into his kitchen sink "[f]or over 8 years." This letter added that, after his wife's death, the author had been hospitalized and in a

nursing home for almost a year following a stroke. The author then stated that, when his son returned to the unit, "the run-off sewer overflowing from the kitchen sink had completely rotted all the kitchen counters." The letter further stated that sewer water "continues to flow out of the sink despite our pleas with [defendant] to fix the building's sewer system."

¶ 18 Finally, defendant included a letter from its general counsel, Ellis Levin, to plaintiff dated December 4, 2008. This letter stated in relevant part that, based upon the findings of defendant's plumbing subcontractor and "City inspectors," water damage to unit 1-F came from plaintiff's unit (2-F), and thus defendant has no responsibility for that damage.

¶ 19 On May 11, 2022, plaintiff filed his response to defendant's motion for summary judgment. Plaintiff first recounted that his complaint was initially filed as a counterclaim to a complaint defendant brought against him, which the trial court subsequently dismissed without prejudice, allowing plaintiff one year to refile the counterclaim. Plaintiff then argued that defendant waived any statute of limitations defense because section 13-207 of the Code allows a counterclaim to proceed despite noncompliance with the applicable statute of limitations.

¶ 20 Plaintiff further argued that there was "ample evidence" demonstrating that defendant's negligence (namely, its breach of fiduciary duty) "in 2018[ ] and thereafter" caused substantial damage to plaintiff's unit. Plaintiff noted that his amended complaint alleged that defendant failed to discharge its fiduciary duties to properly maintain the building's plumbing "through at least May of 2013." Plaintiff included the following exhibits to his response: the deposition testimony of defendant's plumber (Cazim Perazic), the deposition testimony of plaintiff's "plumbing expert" (Robert Leslie), and plaintiff's affidavit.

¶ 21 With respect to Perazic's deposition testimony, plaintiff stated that Perazic had been the building's plumber since 2018, and his testimony showed that defendant "breached its fiduciary duties [sic] to maintain the plumbing in the building." Plaintiff recounted Perazic's testimony that,

7

when Perazic began working as the plumber for the building in December 2018, the kitchen waste pipes and lines needed "a lot of work" and had not been serviced properly in the past. In addition, Perazic stated that defendant refused to follow his suggestion of having the "riser lines" in the plumbing system "rodded" (including the "risers") four times per year. The transcript of Perazic's testimony indicated that, when he first arrived at the building in November or December 2018, the kitchen waste pipes and lines had not been serviced properly, but he did not know how often defendant had serviced them. Perazic further stated that, he "wash[es] the lines and rod[s]" every six months, which he explained "gives us enough time not to clog anything in between those months." Perazic later confirmed that his service lasts for about six months. Finally, Perazic was asked whether or how many times Chicago requires rodding. In response, Perazic stated, "Well, nobody requires. You don't have to rod it ever."

¶ 22    Leslie's deposition transcript indicated that the first (and only) time he went to the unit was in June 2021. When he inspected the unit at that time, he "didn't see anything wrong with it," and that, with respect to the smell, everything had been "cleaned up" when he arrived. He added that the water in the kitchen sink "was going down at the time" and that he tested the drains and tub in the bathroom and observed "no debris" or backup at that time. Although Leslie opined that the building should have been "fully pumped out" at least four times per year, he conceded that he did not know of any city ordinance requiring the pumping out of a building's plumbing system. Leslie further stated that defendant's practice of pumping out the building's plumbing system twice per year was "probably not near enough," but he also admitted that he never personally inspected the building's plumbing system. With respect to plaintiff's unit, Leslie was shown a video of plaintiff's unit that had been recorded in November 2019. After viewing that video, Leslie stated, *inter alia*, that if you do not use the sink and pipes for a while, there would be a sewer smell. In addition, Leslie agreed that, after viewing a plastic pipe with a "bowl of water in it" underneath

the kitchen sink, any leak from that pipe was the responsibility of the homeowner. Finally, Leslie was asked, "Do you think this is proper care and maintenance of one[']s property?" Leslie responded, "Personally, no."

¶ 23 Plaintiff also attached a document entitled, "Rule 213(F)(3) Disclosure for Plumber Bob Leslie," which recited in relevant part the following conclusion:

> "The failure to properly maintain the Building kitchen sink drain catch basin, and related interior Building plumbing lines, *** proximately caused the 2008 backup and overflow of kitchen waste into Unit 2F, *** the backup and overflow of the kitchen waste into Unit 2F in 2019, and *** the backup and overflow of the kitchen waste into Unit 2F in 2021."

This disclosure further stated that "the failure to properly maintain the Building bathroom plumbing lines proximately caused the backups, *** because there is nothing to indicate that the owner or occupant of Unit 2F caused the backups."

¶ 24 Plaintiff's affidavit stated in relevant part that, around November 14, 2019, he entered the unit with Kieran Conlon and was overwhelmed with a very strong smell of sewage throughout the unit. Plaintiff also saw large amounts of dark, greasy material in his kitchen sink, on the countertop, on the cabinets below the kitchen sink, and on the floor of the unit. Plaintiff added that "the stench was unbearable to [him]." He later learned that the material was not sewage but instead overflowing kitchen waste. In the bathroom, plaintiff saw what he believed was "dark-colored feces" in the toilet and bathtub, as well as the sink, where the material appeared to have overflowed onto the bathroom floor. Plaintiff stated that Conlon cleaned up the unit.

¶ 25 Plaintiff further stated that, on June 7, 2021, he returned to the unit with Conlon and a realtor, Mary O'Connor, his designated "expert witness *** in this case." Plaintiff stated that he

again noticed an overwhelming smell of sewage, similar to what he had observed in November 2019. Plaintiff also observed a dark, greasy material in the kitchen sink and on kitchen cabinets, countertop, and the floor throughout the unit. Plaintiff also saw brown-colored "water stains" on the floor tiles (which were "buckled"), baseboards, wallboard, hallway leading to the bedroom, primary bedroom, as well as the furniture legs and certain pieces of art that had been stacked on the floor. In addition, he noted "numerous dead white flies surrounding the perimeter walls" of the living room and damage to rugs and books on a shelf near the floor. Finally, plaintiff stated that his observations in June 2021 were "my observations of new conditions" that "occurred after *** Conlon cleaned" the unit in November 2019.

¶ 26    On June 22, 2022, defendant filed its reply in support of its motion for summary judgment. Defendant first argued that section 13-207 does not "save" plaintiff's claims because he knew about the claims prior to October 1, 2009. Defendant explained that it filed its original eviction action against plaintiff on August 10, 2015, which plaintiff argued triggered the applicability of section 13-207. In that eviction action, defendant claimed that plaintiff was in default on assessments he owed as of September 1, 2014. Defendant further explained that, since the Declaration vested defendant with the authority to file suit for unpaid assessments once an owner is in default for 30 days, defendant's claim for unpaid assessments accrued as of October 1, 2014 (*i.e.*, 30 days after September 1, 2014). Since plaintiff conceded that a five-year statute of limitations applies with respect to his claims, defendant reasoned that section 13-207 only saves plaintiff's claims if plaintiff did *not* have notice of them prior to October 1, 2009 (*i.e.*, five years prior to the unpaid assessments accrual date of October 1, 2014). Defendant then pointed to the "undisputed evidence" establishing that plaintiff's awareness of his claim *did* occur prior to October 1, 2009, thus barring his claim as untimely under the five-year statute of limitations.

Defendant further argued in the alternative that plaintiff's claims were not proper counterclaims to defendant's eviction action, rendering section 13-207 inapplicable.

¶ 27    On August 12, 2022, the trial court entered a written order granting defendant's motion for summary judgment on counts I and IV.  The court denied the motion as to counts II and III, and it continued the matter to September 13, 2022.

¶ 28               Plaintiff's Motion to Reconsider and Subsequent Proceedings

¶ 29    On August 25, 2022, plaintiff filed his motion to reconsider the trial court's order granting summary judgment in favor of defendant.  Plaintiff argued, *inter alia*, that the court failed to address the breach of fiduciary duty claims relating to the 2019 and 2021 kitchen waste and sewage backups into the unit.  In particular, plaintiff argued that, since the 2019 and 2021 kitchen sink waste and sewage backups occurred more than 10 years after the 2008 backup, there was not a "continual backup."  Instead, plaintiff (recounting his deposition testimony the backups occurred again "a 'long time after' " the 2008 backup) argued that there was a long period between the 2008 backup and the subsequent backup in November 2019.  Citing *Hassebrock v. Ceja Corporation*, 2015 IL App (5th) 140037, plaintiff argued that case law "has suggested" that the statute of limitations for breach of fiduciary duty claims should be analogized to the statute of limitations for breach of contract claims.  Plaintiff then recited that continuous performance contracts can be partially breached on numerous occasions, with each partial breach separately actionable and subject to its own accrual date and limitations period.  Plaintiff then contended that the Declaration's plain language required continuous performance when it imposed a duty on defendant to maintain the building's plumbing systems.  Plaintiff thus asked the court to reconsider and vacate its order granting summary judgment in favor of defendant.

¶ 30    On December 1, 2022, the trial court denied plaintiff's motion.  Plaintiff later moved to voluntarily dismiss counts II and III pursuant to section 2-1009 of the Code.  On November 6,

2023, the trial court granted plaintiff's motion and further found that there was no just reason to delay enforcement or appeal of the order. This timely appeal follows.

¶ 31                                        ANALYSIS

¶ 32    On appeal, plaintiff contends that the trial court erred in granting summary judgment in favor of defendant on two bases. First, plaintiff contends that there was a genuine issue of material fact as to the timeliness of his claims regarding the 2019 and 2021 sewage backups. Second, plaintiff contends that there was also a genuine issue of material fact regarding the timeliness of his 2008 sewage backup claims pursuant to section 13-207 of the Code.

¶ 33    Summary judgment is appropriate if the pleadings, depositions, admissions, and affidavits show that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2020). "Although summary judgment is encouraged in order to aid the expeditious disposition of a lawsuit, it is a drastic means of disposing of litigation." *Monson v. City of Danville*, 2018 IL 122486, ¶ 12. Accordingly, summary judgment should only be granted when the moving party's right to judgment is " 'clear and free from doubt.' " *Colon v. Illinois Central R.R. Co.*, 2024 IL App (1st) 221841, ¶ 27 (quoting *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992)). If reasonable people would draw divergent inferences from undisputed facts, summary judgment is inappropriate. *MEP Construction, LLC v. Truco MP, LLC*, 2019 IL App (1st) 180539, ¶ 12 (citing *Williams v. Manchester*, 228 Ill. 2d 404, 417 (2008)).

¶ 34    To determine whether there is a genuine issue of material fact, we construe the pleadings, depositions, admissions, and affidavits strictly against the moving party and liberally in favor of the opponent. *Id.* ¶ 12 (citing *Outboard Marine*, 154 Ill. 2d at 131-32). It is well established that "facts contained in an affidavit in support of a motion for summary judgment which are not contradicted by counteraffidavit are admitted and must be taken as true for purposes of the

motion." *Purtill v. Hess*, 111 Ill. 2d 229, 241 (1986) (citing *Heidelberger v. Jewel Cos.*, 57 Ill. 2d 87, 92-93 (1974)). Nonetheless, "[s]tatements in an affidavit which are based on information and belief or which are unsupported conclusions, opinions, or speculation are insufficient to raise a genuine issue of material fact." (Alteration in the original.) *MEP Construction*, 2019 IL App (1st) 180539, ¶ 13 (quoting *Outboard Marine*, 154 Ill. 2d at 132). In addition, a party's admissions contained in an original verified pleading are judicial admissions that bind the pleader throughout the litigation, even after the filing of an amended pleading that supersedes the original, unless they are the product of mistake or inadvertence. *Id.*

¶ 35 We review a trial court's entry of summary judgment *de novo*. *Outboard Marine*, 154 Ill. 2d at 102.

¶ 36                                     The Statute of Limitations

¶ 37 Plaintiff alleged a breach of fiduciary duty in count I. To prove such a claim, a plaintiff must show that a fiduciary duty existed, that the defendant breached its fiduciary duty, and that the breach proximately caused the plaintiff's injury. *Pippen v. Pedersen & Houpt*, 2013 IL App (1st) 111371, ¶ 21. Plaintiff's amended complaint also asserted a breach of contract in count IV. The essential elements of a breach of contract are as follows: (i) the existence of a valid and enforceable contract, (ii) performance by the plaintiff, (iii) breach of the contract by the defendant, and (iv) resultant injury to the plaintiff. *Coghlan v. Beck*, 2013 IL App (1st) 120891, ¶ 27.

¶ 38 Section 13-205 of the Code states in part that, for "all civil actions not otherwise provided for," a cause of action shall be commenced within five years "after the cause of action accrued" (735 ILCS 5/13-205 (West 2022)). The parties agree that, since the breach of fiduciary duty claim arose out of the contractual relationship and the breach of contract claim is substantially the same as the breach of fiduciary duty claim, this residuary clause prescribing a five-year limitations period applies to both the breach of fiduciary duty and the breach of contract claims. See

*Armstrong v. Guigler*, 174 Ill. 2d 281, 294 (1996) (holding that the five-year statute of limitations for all civil actions not otherwise provided for applies for breach of fiduciary duty claims "regardless of the fact that *** the fiducial relationship arose from a written contract").

¶ 39    A cause of action accrues under the statute when the plaintiff "knew or reasonably should have known that it was injured and that the injury was wrongfully caused." *Superior Bank FSB v. Golding*, 152 Ill. 2d 480, 488 (1992).    A plaintiff reasonably should know that an injury is wrongfully caused when he has enough information about the injury to alert a reasonable person about the need for additional inquiry to determine if the cause of the injury is legally actionable. *Lubin v. Jewish Children's Bureau of Chicago*, 328 Ill. App. 3d 169, 172 (2002).    The limitation period begins when the plaintiff is injured, not when the plaintiff realizes the consequences of the injury or the full extent of the injury.  *Khan v. Deutsche Bank AG*, 2012 IL 112219, ¶ 45.  "That damages are not immediately ascertainable does not postpone the accrual of a claim."  *Indiana Insurance Co. v. Machon & Machon, Inc.*, 324 Ill. App. 3d 200, 304 (2001).  The point at which the limitations period began to run is generally a question of fact, but it becomes a question of law where the undisputed facts show that only one conclusion can be drawn.  *Lubin*, 328 Ill. App. 3d at 172; see also, generally, *Berry v. G. D. Searle & Co.*, 56 Ill. 2d 548, 559 (1974).

¶ 40    In this case, construing the pleadings, depositions, admissions, and affidavits strictly against defendant and liberally in favor of plaintiff, as we must (see *Outboard Marine*, 154 Ill. 2d at 131-32), we hold that the trial court properly granted summary judgment in favor of defendant. On April 12, 2016, plaintiff originally filed these claims as a counterclaim to an unrelated complaint defendant had filed against plaintiff.  Thus, plaintiff's claim is barred if he was wrongfully injured before April 12, 2011.  The undisputed evidence here establishes that plaintiff testified at his deposition that he had been aware of sewer backups since the time his parents moved into the unit in 1996.  Plaintiff further admitted that, after the 2008 backup occurred, (1) defendant

informed him in December 2008 that it considered the matter to be plaintiff's responsibility and not defendant's, and (2) the 2008 backup had not been resolved as of the time of his deposition on February 5, 2021. On these facts, plaintiff knew or reasonably should have known that he was wrongfully injured no later than December 2008, after the 2008 backup, which had never been resolved and for which defendant disclaimed any responsibility. At that point, the statute of limitations began running. See *Superior Bank FSB*, 152 Ill. 2d at 488. Plaintiff then had five years from that time, *i.e.*, until December 2013, to file his complaint. See *Armstrong*, 174 Ill. 2d at 294. Plaintiff, however, filed his complaint in April 2016, well outside the statute of limitations. His claim is thus barred as untimely, and consequently the court properly granted summary judgment in favor of defendant.

¶ 41 Plaintiff nonetheless argues that the trial court erred in granting defendant's summary judgment motion because his claims related to the backups in 2019 and 2021 were timely based upon defendant's "continuing duty to maintain *** the building plumbing systems." Plaintiff cites multiple cases in support of this claim: *Duffy v. Orlan Brook Condominium Owners' Ass'n*, 2012 IL App (1st) 113577, ¶¶ 15-27; *Hi-Lite Products Co. v. American Home Products Corp.*, 11 F.3d 1402, 1408 (7th Cir. 1993); and *Hassebrock v. Ceja Corp.*, 2015 IL App (5th) 140037. Defendant responds in part that plaintiff has forfeited this argument because he belatedly raised it in his motion to reconsider. Forfeiture aside, plaintiff's claim is unavailing.

¶ 42 As noted above, the limitations period began when plaintiff was injured, not when he realized the consequences or full extent of his injury. See *Khan*, 2012 IL 112219, ¶ 45. In addition, although there may have been a period of time when the damage from the backup was not apparent, that lull did not postpone the accrual of his claim. See *Indiana Insurance*, 324 Ill. App. 3d at 304. Here, the period began when plaintiff was injured, *i.e.*, no later than December 2008. Although there may have been a period of time in which there were no backups, plaintiff nonetheless

admitted that the 2008 backup had never been resolved, fatally undermining any claim that the 2018 and 2019 backups were new breaches (thus rescuing them from the statute of limitations).

¶ 43    Furthermore, neither *Duffy*, *Hi-Lite*, nor *Hassebrock* are helpful to plaintiff. First, *Duffy* neither discussed the statute of limitations nor whether a purported continuing contractual duty could vitiate the statute of limitations for a breach of fiduciary duty claim. See generally *Duffy*, 2012 IL App (1st) 113577, ¶¶ 15-27. As to *Hi-Lite*, setting aside the fact that decisions from lower federal courts are not binding on this court (*Travelers Insurance Co. v. Eljer Manufacturing, Inc.*, 197 Ill. 2d 278, 302 (2001)), it is factually distinguishable. There, two contracts were at issue: one written in 1977 and another purportedly oral contract in 1987. *Hi-Lite*, 11 F.3d at 1404-05. Here, by contrast, there was a single contract, and to the extent that plaintiff argues that defendant's failure to maintain the plumbing system is a continuing violation, that doctrine is inapplicable to claims for breach of contract unless the contract involves continuous performance, such as a money obligation payable in installments. See, *e.g.*, *Hassebrock*, 2015 IL App (5th) 140037, ¶¶ 33, 35. Plaintiff's amended complaint asserts no claim for breach of a contract involving continuous performance, and nothing in the record shows that plaintiff ever requested leave to amend the complaint to add such a claim. Finally, as we have just indicated, *Hassebrock* held that the continuing violation doctrine applies as a defense to the statute of limitations regarding a *tort* involving continued repeated injury. *Hassebrock*, 2015 IL App (5th) 140037, ¶ 33. The court added that neither breach of contract nor breach of a fiduciary duty is a tort, rendering this doctrine inapplicable. *Id.* The court did acknowledge, however, that for contracts such as those involving a money obligation payable in installments, the statute of limitations begins to run against each installment on the date it becomes due. *Id.* ¶ 35. Here, the contract at issue does not involve a money obligation and the doctrine is otherwise inapplicable in accordance with *Hassebrock* because, based upon the undisputed evidence, defendant's purported breach was total—not

partial—and took place far outside of the five-year statute of limitations. *Duffy*, *Hi-Lite*, and *Hassebrock* are unavailing. We thus reject plaintiff's claim of error.

¶ 44                                                Section 13-207

¶ 45     Plaintiff further argues that there is a genuine issue of material fact as to whether Section 13-207 of the Code saved his claim from the statute of limitations. Specifically, plaintiff notes that he originally filed his claims as a counterclaim to defendant's prior complaint for collection of unpaid fees, and pursuant to section 13-207, any statute of limitations defense against plaintiff's counterclaim is forfeited. Plaintiff adds that the trial court dismissed this counterclaim without prejudice to plaintiff refiling the matter within one year. Plaintiff then claims that his subsequent timely refiling of this matter as a standalone complaint would render any statute of limitations defense similarly forfeited. Defendant responds that the court properly rejected this argument and that, in any event, section 13-207 is inapplicable because plaintiff's counterclaim is not a proper counterclaim to the original collection action.

¶ 46     Section 13-207 provides in part as follows: "A defendant may plead a *** counterclaim barred by the statute of limitation ***, while held and owned by him ***, to any action, the cause of which was owned by the plaintiff ***, before such *** counterclaim was so barred, and not otherwise." 735 ILCS 5/13-207 (West 2020). "Section 13-207 is a 'saving' provision that allows a counterclaim to proceed despite the failure to comply with the appropriate statute of limitations period." *Barragan v. Casco Design Corp.*, 216 Ill. 2d 435, 446 (2005). In other words, section 13-207 does the opposite of a statute of limitations: "Instead of barring a claim after a specified period or setting a date for accrual of the claim, it saves otherwise barred claims." *Id.* at 449. This section essentially recognizes that litigants do not always file every possible claim they have in a prompt manner; rather, some may wait until "they are hauled into court as a defendant." *Byline Bank v. Integra Properties, Inc.*, 2021 IL App (1st) 201021, ¶ 17 (citing *Barragan*, 216 Ill. 2d at

446). " 'One purpose of section 13-207 is to protect parties who have shorter limitations periods than their opponents.' " *Id.* ¶ 21 (quoting *Barragan*, 216 Ill. 2d at 446). As a practical matter, this section was designed to "prevent a plaintiff from intentionally filing late claims or 'gaining a tactical advantage by delaying his filing so that, while his pleading comes within the time period of the statute of limitations, any counterclaim would be outside the period and therefore barred.' " *Id.* ¶ 24 (quoting *Mermelstein v. Rothner*, 349 Ill. App. 3d 800, 804 (2004)).

¶ 47     In this case, defendant's collection claim against plaintiff accrued on October 1, 2014. Therefore, pursuant to section 13-207, plaintiff's claims are only preserved if they were viable as of that date. As discussed *supra*, however, plaintiff's claims were no longer viable five years after December 2008, the latest possible date that plaintiff would have reasonably been on notice that he was wrongfully injured. Accordingly, plaintiff's argument on this point is unavailing.

¶ 48     Moreover, plaintiff's reliance upon *Barragan* is misplaced. In *Barragan*, the defendant (Casco) filed a contribution claim against a third party (Osman), and Osman then filed a counterclaim—also for contribution—against Casco. *Barragan*, 216 Ill. 2d at 437. Osman's claim against Casco accrued on July 25, 1997, and it became time-barred on July 25, 1999. *Id.* at 445. By contrast, Casco had until September 15, 1999, to file its counterclaim against Osman, and it did so on July 29, 1999—four days *after* Osman's counterclaim became time barred. *Id.* at 446. Osman filed its counterclaim in response on December 7, 2000, and the issue was whether section 13-207 saved that otherwise time-barred claim. *Id.* at 437-38. The *Barragan* court held that section 13-207 applied because Casco owned its contribution claim *before* Osman's counterclaim was barred. *Id.* at 446. Here, however, Thorndale's complaint for unpaid fees against plaintiff vested on October 1, 2014. At that time, plaintiff's counterclaim was already barred for the reasons stated above. Under these facts, section 13-207 does not save plaintiff's claims. We therefore reject his final contention of error.

¶ 49    Since we have held that section 13-207 is inapplicable to plaintiff's claim because the claim was already time-barred at the time defendant filed its prior complaint for unpaid fees, we need not discuss defendant's other argument that section 13-107 does not apply because plaintiff's counterclaim was an improper counterclaim to defendant's prior complaint pursuant to section 9-106 of the Code (735 ILCS 5/9-106 (West 2022).

¶ 50                                CONCLUSION

¶ 51    Summary judgment in favor of defendant was warranted because plaintiff's claims are barred by the statute of limitations. Accordingly, we affirm the judgment of the trial court.

¶ 52    Affirmed.